**CAPE MAY COUNTY CHAPTER, INC., IZAAK WALTON LEAGUE OF AMERICA, By Jonathan Sayre, President, and on behalf of others, Plaintiff,**

v.

**Tito MACCHIA et al., Defendants.**

**Civ. A. No. 1037–70.**

United States District Court,
D. New Jersey.

June 16, 1971.

Brown, Connery, Kulp, Wille, Burnell & Greene, by Horace G. Brown, Camden, N. J., Cohen, Hirschkop, Hall & Jackson, Alexandria, Va., by Bernard S. Cohen, Alexandria, Va., of counsel, for plaintiff.

Orlando & Orlando, Haddonfield, N. J., by Archibald Kreiger, Paterson, N. J., for defendants Macchia and Ruetschlin.

Herbert Stern, U. S. Atty., by D. William Subin, Asst. U. S. Atty., Camden, N. J., for defendants Secretary of the Army and U. S. Army Corps of Engineers.

George F. Kugler, Jr., Atty. Gen., of New Jersey, by Malcolm S. Zlotkin, Deputy Atty. Gen., for defendant Commissioner of Environmental Protection of the State of New Jersey.

George M. James, Wildwood, N. J., for defendant, Jerry H. May, Jr.

## OPINION

COHEN, District Judge:

Ecology looms as the issue of the decade. Man's mounting apprehension for the preservation of his physical environment sounds a "clear and present danger" to his survival, unless an ecological balance is maintained. Scientific reports emphasizing the danger and the need for realistic legislative protection of the environment have been featured in the Press and forcibly brought to the attention of State legislatures and governmental agencies. Ecological conferences have been convened in the leading capitols of the World. And our own Congress, prompted by this momentum, has made environmental quality and its intelligent control a matter of national concern.

Mindful of the critical impact of man's tremendous technological advance upon nature, far-reaching legislation was recently enacted imposing certain safeguards for the protection of our natural resources and for the enhancement of our environment: the National Environmental Policy Act of 1969 (effective January 1, 1970), 42 U.S.C. sec. 4321, et seq. (NEPA);[1] the Environmental Quality Improvement Act of 1970, 42 U.S.C. secs. 4371-4;[2] and the Water Quality Improvement Act of 1970, 33 U.S.C. sec. 1151.[3]

The plaintiff, the Cape May County Chapter, Inc. of the Izaak Walton League of America (Walton League), a renowned nonprofit corporation, in support of its complaint to enjoin certain conduct

---

[1]. *The National Environmental Policy Act of 1969*, 42 U.S.C. § 4321:

"The purposes of this act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality."

[2]. *Environmental Quality Improvement Act of 1970*, 42 U.S.C. sec. 4371:

Congressional findings, declarations, and purposes: "(a) The Congress finds—(1) that man has caused changes in the environment; (2) that many of these changes may affect the relationship between man and his environment; and (3) that population increases and urban concentration contribute directly to pollution and the degradation of our environment. (b) (1) The Congress declares that there is a national policy for the environment which provides for the enhancement of environmental quality. This policy is evidenced by statutes heretofore enacted relating to the prevention, abatement, and control of environmental pollution, water and land resources, transportation, and economic and regional development."

[3]. *The Water Quality Improvement Act of 1970*, 33 U.S.C. sec. 1151(a):

"The purpose of this chapter is to enhance the quality and value of our water resources and to establish a national policy for the prevention, control, and abatement of water pollution."

of the defendants, invokes such legislation, as well as that of greater vintage, i. e., the Fish and Wildlife Coordination Act of 1934, 16 U.S.C. sec. 661 et seq.,[4] the Rivers and Harbors Act of 1899, 33 U.S.C. sec. 403[5] and the Refuse Act of 1899, 33 U.S.C. sec. 407,[6] on its behalf and on behalf of all persons having beneficial rights and interests in the sub-aqueous lands, tidal marshes, tidal waters and related natural marine resources in the vicinity of Gravens Island, Middle Township, Cape May County, New Jersey. As a local component of the Walton League an Illinois corporation, the plaintiff Chapter has been chartered, among other educational functions, to foster and to promote public appreciation of marine

4. *The Fish and Wildlife Coordination Act,* 16 U.S.C. § 662(a):
"Except as hereafter stated in subsection (h) of this section, [not applicable] whenever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States or by any public or private agency under Federal permit or license, such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particular State wherein the impoundment, diversion, or other control facility is to be constructed, with a view to the conservation of wildlife resources by preventing loss of and damage to such resources as well as providing for the development and improvement thereof in connection with such water-resource development."

5. *The Rivers and Harbors Act,* 33 U.S.C. § 403:
"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

6. *Refuse Act of 1899,* 33 U.S.C. § 407:
"It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: *Provided,* That nothing herein contained shall extend to, apply to, or prohibit the operations in connection with the improvement of navigable waters or construction of public works, considered necessary and proper by the United States officers supervising such improvement or public work: *And provided further,* That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful."

and marine-related natural resources and environment and to actively engage in programs for their protection. The League has a long history in conservation matters and has been directly responsible for the enactment of a great deal of protective legislation in this field.

The pertinent chronological facts giving rise to this controversy are alleged to have germinated in 1965. The defendants Tito Macchia and James H. Ruetschlin, together with their respective wives Antonietta and Kathryn M. and their affiliated corporations (to be referred to as the Macchia group) are real estate operators and land developers who have an interest in the lands which are the subject of this suit. On August 28, 1965, the Macchia group held, by virtue of riparian ownership, certain limited rights to portions of Gravens Island which they conveyed to the Cape May County Bridge Commission to enable the Commission to construct a causeway, now known as New Avalon Boulevard, connecting the mainland to and bisecting the Island. This conveyance was subject to a reservation by the defendant grantors of their right to construct an intersection across Avalon Boulevard so that they, their heirs and assigns would have access north and south of New Avalon Boulevard, to and from the lands and waters of Gravens Island. The Island consists of approximately 110 acres of filled land and 250 acres of tidal marshes. In 1966, the New Jersey Department of Conservation and Economic Development granted a permit to Macchia to dike, dredge and fill [7] 65 acres of the Island, north of the new causeway. In May of 1967, Macchia applied to the New Jersey Resources Council for riparian rights to a 600 feet-wide strip of land south of and parallel with the New Avalon Boulevard, which were granted. This application was filed with the Commissioner of the then newly constituted Department of Environmen-

tal Protection (formerly Department of Conservation and Economic Development) for his approval, yet to be given. Since 1965, the Macchia group has been continuously developing the filled land in question for the construction of private housing.

During the past several years, the Macchia group and other promoters, with similar permits to bulkhead, dredge and fill, have been developing similar land areas in Middle Township. It should be noted that during the course of this work, certain sections of land in the vicinity were preserved by the State of New Jersey as parks and wildlife refuges. According to the Attorney General of New Jersey, permits for this type of work are issued only after on site inspections by the staff of the State Bureau of Navigation and, as well, only after recommendation by a majority of the New Jersey Resources Council members and upon approval by the Commissioner.

The plaintiff, Walton League, claims that Macchia exceeded the 65-acre fill permit issued in 1966, by land-filling more than 90 acres, thereby obliterating the free flow tidal character of the northern portion of the Island; further, that Macchia is diverting the navigable tidal waters on the southern portion of the Island, by dredging, diking and filling 20 acres from the Long Reach, a navigable waterway of the United States, and doing so with the permission of the defendant, United States Corps of Engineers, thereby destroying finfish, shellfish and other forms of marine life, as well as the entire "habitat, nursery, and feeding grounds essential to the fisheries of the Continental Shelf of the Atlantic Ocean which is in close proximity to it and essential to the food chain of the Middle Atlantic ecosystem." The plaintiff further complains that on June 11, 1970 Macchia applied to the Department of Environmental Protection, Division of

---

7. The Macchia group of defendants, according to the complaint, has been active over the past 5 years, dredging sand and silt from the bottoms, and sometimes the borders, of navigable waters in Cape May County, New Jersey, which materials were pumped in behind dikes erected for that specific purpose in order to fill the marshes, thus providing solid land areas for the eventual construction of houses.

Water Policy and Supply of the State of New Jersey, for a permit to divert up to 500,000 gallons daily of fresh water from wells in the area to serve the proposed development and which, if granted, would contribute to the permanent destruction of Gravens Island. These deleterious activities by the defendants, asserts the plaintiff, irreparably damage the publicly owned marine life and related natural resources, which in this area, depend upon portions of the Island for their existence, and which the State of New Jersey has a fiduciary obligation to conserve and protect for the public benefit. Despite this binding obligation, maintains the plaintiff, the State officials, with the approval of Federal officials, have cooperated with the defendants, whether consciously aware of the consequences or not, in irreparably destroying invaluable natural marine resources in violation of the *NEPA* and other salutary *Acts*, for which conduct the plaintiff seeks relief.

The plaintiff requests a *Declaratory Judgment,* pursuant to 28 U.S.C. secs. 2201, 2202,[8] injunctive relief and damages against the defendants, Macchia, Ruetschlin, the corporations owned and affiliated with the Macchias and the Ruetschlins and, as well against Stanley A. Resor, Secretary of the Army, Colonel James A. Johnson, United States Army Corps of Engineers, Richard J. Sullivan, Commissioner of the New Jersey Department of Environmental Protection and Jerry H. May, Jr., Mayor of Middle Township, New Jersey, for their participation in furtherance of the Macchia land development.

In its complaint, judgment in each of four counts is specifically demanded by the plaintiff: (1) for a declaration of the rights of the people of the United States, and of New Jersey in particular, to the protection of their environment and of the natural resources of the Middle Atlantic ecosystem held in trust for their enjoyment; (2) for injunctive relief enjoining the indiscriminate dredging and filling operations in the navigable waters on and adjacent to Gravens Island; (3) for the safeguarding of these natural resources and environment for future generations; and (4) for an order mandating that Federal, State and Local Officials protect the ecological and commercial values of the natural resources held in trust for the public. Further, the plaintiff seeks the nullification of any dredging or land-filling permits issued to and by the defendants; the removal of all dikes in the navigable waters in the area in question; and compensatory damages of $500,000 and punitive damages of $1,000,000 which moneys if recovered, are to be placed in a special trust fund to be administered by Federal and State agencies and earmarked for the restoration of marine-related resources of Cape May County, New Jersey and of the Middle Atlantic ecosystem.

Jurisdiction of the Court is invoked under the general federal jurisdiction provisions of 28 U.S.C. secs. 1331(a), 1343(3) (4) and specifically under the Civil Rights Act, 42 U.S.C. sec. 1983, also under the "commerce clause" of the United States Constitution, Article 1, Sec. 8, cl. 3, and under the Declaratory Judgment Act.

Presented for immediate disposition by the Court are the motions by the defendants for a dismissal of the complaint. Primarily, although raising many issues, they individually and collectively chal-

8. *Declaratory Judgments,* 28 U.S.C. sec. 2201 provides: "In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. sec. 2202 provides: "Further necessary or proper relief based upon a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

**510**

lenge the plaintiff's "standing to sue" as a matter of law and, as well, its representative status in the purported class action. The crucial issue is, therefore, whether a citizens' group such as the plaintiff has standing to maintain a "public" action;[9] and if so, may it, under Rule 23, F.R.Civ.P., act as a representative of a class of others, be they "born or yet unborn."

In addition to the challenge of standing, the following issues have been generated by the defendants and, in the event that it is determined that the plaintiff has standing in either capacity, require disposition:

1. Is there a "federal question" within the jurisdiction of this Court?

2. Is the defendant New Jersey Environmental Commissioner, a representative of the State, immune from this action by reason of the doctrine of sovereign immunity?

3. Is this action an improper invasion of the riparian rights reserved to the State of New Jersey or those derived from the Federal Government?

4. Is the doctrine of "abstention" indicated in this case because it is
 a) premature;
 b) a political question;
 c) not a case or controversy in the Constitutional sense;
 d) one in which there is an adequate remedy at law in New Jersey State Courts?

5. Is the complaint lacking in specification of injury in fact relatable to the plaintiff? Is it barred by laches?

■■■■ The threshold question, of course, in this domino-erection of issues, is that of standing. Absent such, all others are moot and must fall. It is the opinion of this Court that the plaintiff does have sufficient legal standing under *NEPA* to maintain this action, both in its own right and representatively on behalf of the class it purports to represent. The reasons dictating this conclusion will be advanced and the other issues treated appropriately.

Although not providing complete resolution, much light has been cast upon the ever controversial question of "standing to sue" by two recent cases in which guidelines have at least been indicated: Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). As observed in *Data Processing*, generalizations are of little value, for we must be mindful of the more compelling Constitutional concept of "cases and controversies," in order to establish standing in the truly adversary sense. At least this is the jumping-off point in approaching each particular problem. As stated by former Chief Justice Warren in Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968):

> "[I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution."

*Data Processing* reaffirmed this beginning point. In that case, the petitioners challenged a ruling by the Comptroller of the Currency which permitted national banks to provide data processing services, similar to those of petitioners, to other banks and customers. Petitioners claimed that this ruling authorized unfair competition in violation of their rights.

9. See: Hanks, An Environmental Bill of Rights: The Citizen Suit and the National Environmental Policy Act of 1969, 24 Rutgers L.Rev. 230 (1970); Jaffe, The Citizen as Litigant in Public Actions: The Non-Hohfeldian or Ideological Plaintiff, 116 U.Pa.Law Rev. 1033 (1968) and Standing Again, 84 Harv.L.Rev. 633 (1971); Davis, Administrative Law, Ch. 22 p. 702 (1970 Supp.); Davis, Standing: Taxpayers and Others, 35 U.Chi. L.Rev. 601, 619 (1968); and Davis, The Liberalized Law of Standing, 37 U.Chi. L.Rev. 450, 457–458 (1970).

The Court held that the petitioners had standing to maintain their action, as they experienced economic injury and were "aggrieved" persons within the Administrative Procedure Act, 5 U.S.C. sec. 701 et seq. The Court then laid down two tests regarding the federal adversary requirement: (1) "* * * whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise;" and (2) "* * * whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (397 U.S. pp. 152–153, 90 S.Ct. p. 830.)

In *Barlow*, decided the same day as *Data Processing*, the petitioners, tenant farmers, challenged an amended federal agency regulation permitting the withholding by their landlords of moneys due these farmers for farming and produce, which funds were to be applied first toward rents due the landlords under the farm leases. Under these circumstances, the Supreme Court declared that the petitioners had "standing to sue" within the requirements of *Data Processing*. Apparently, the tenant farmers suffered economic "injury in fact" and were "arguably within the zone of interests" sought to be protected.

Gauged against the criteria set down by the United States Supreme Court in these recent cases, there seems no doubt that the plaintiff, a local chapter of the Izaak Walton League, a renowned environmentalist group, will resolutely press forward in this action well within the "constitutional adversary context," and that plaintiff meets the requirements of "injury of fact" and "zone of interests." We find support for this position in several recent federal decisions. As observed in Izaak Walton League v. St. Clair, 313 F.Supp. 1312 at page 136 (D.C. Minn.1970):

> "The League has a long history of activity in conservation matters and natural resource preservation. It has been active for many years in urging congressional and legislative action."

\* \* \* \* \* \*

> "The second Association of *Data Processing* requirement, a nonconstitutional one, is that plaintiff must allege 'that the challenged action has caused him injury in fact, economic or otherwise.' It is of course a fact that plaintiff does not own any of the land nor does it claim to own any mineral rights in the Boundary Waters Canoe Area, nor does it have any real economic interest in the outcome of the suit since it is a not-for-profit corporation."

However, the Court continues at page 1317:

> "The Izaak Walton League is not a 'johnny-come-lately' or an *ad hoc* organization and its interest in the wilderness movement is continuing, basic and deep. It therefore has an 'aesthetic, conservational and recreational' interest to protect. This gives it standing and meets the second requirement of *Association of Data Processing*".

A similar approach to the *Data Processing* two-prong test was employed in the recent case of Sierra Club v. Hardin, 325 F.Supp. 99, (D.C.Alaska, 1971). This case generally reviewed the leading cases predating *Data Processing* and found the current law, or trend at least, to be for a finding of standing by conservation groups championing the individual and public interest in aesthetic values involved with our national resources and sought to be protected in the federal courts by federal legislation. As stated in *Data Processing*:

> "Where statutes are concerned, the trend is toward enlargement of the class of people who may protect administrative action. The whole drive for enlarging the category of aggrieved 'persons' is symptomatic of that trend" (397 U.S. 150 at p. 154, 90 S.Ct. 827 at p. 830, 25 L.Ed.2d 184).

Another District Court decision, in our own Circuit, likewise found standing but dismissed the complaint on the grounds of lack of retroactivity of the *NEPA*, and sustained the defense of sovereign

immunity. Pennsylvania Environmental Council, Inc. v. Bartlett, D.C., 315 F. Supp. 238, 245, appeals docketed Nos. 19373, 19453 (3 Cir. Nov. 30, 1970) and pending. The Fourth Circuit also found standing for a conservation group. The West Virginia Highlands Conservancy v. Island Creek Coal Company, 441 F.2d 232 (4 Cir. 1971). Also in accord: Delaware v. Pennsylvania, New York Central Transportation Company, 323 F. Supp. 487 (D.C.Del.1971). There are, of course, cases to the contrary. See e. g. Alameda Conservation Ass'n v. Calif., 437 F.2d 1087 (9 Cir. 1971); Sierra Club v. Hickel, 433 F.2d 24 (9 Cir. 1970), comment 71 Col.L.Rev. 172 (1971), cert. granted, 401 U.S. 907, 91 S.Ct. 870, 27 L.Ed.2d 805 (1971) and Brooks v. Volpe, 329 F.Supp. 118 (W. D.Wash.1971).

In *Hardin,* the Court noted (325 F. Supp. p. 109), that notwithstanding *Data Processing,* the increasing liberalization of standing regarding conservation groups has not escaped criticism, for in two recent decisions in the Ninth Circuit and one in the District of Columbia Circuit more stringent requirements were imposed upon such groups where the administration of public lands is involved. In *Hickel* and Ballerina Pen Co. v. Kunzig, 433 F.2d 1204 (D.C.Cir. 1970), the Courts indicated that the "zone of interest" requirement of *Data Processing* did not establish a test distinct from the requisite "injury in fact." See *Ballerina, infra.*

In *Hickel,* the Court pointed out that the conduct complained of was alleged to be merely "displeasing or distasteful" to the plaintiff, rather than injurious in fact and hence insufficient to constitute legal "standing to sue." In that case, a non-profit California corporation composed of approximately 78,000 national members, with some 27,000 residing in the San Francisco Bay Area, sought to enjoin the grant of a permit to Walt Disney Productions, by the Secretaries of Agriculture and of the Interior, for the construction of a commercial-recreational area in the Sequoia National Forest, with an access road carved into the forest. The Court found no "injury in fact," past or future, asserted by the plaintiff. Such, stated the Court, was the principal test fixed in *Data Processing* and " 'Standing to sue', as the phrase indicates, refers to the posture of the plaintiff and not to the 'legal interest' to be unravelled." (*Hickel,* 433 F.2d p. 31). Furthermore, the Court found a compatibility of interests rather than an adversity between the plaintiff and the defendant federal officials, in the protection of our national forests.

In *Brooks,* it was held that *individuals* who used the recreational area, through which a highway was in the process of construction had "standing to sue" to enjoin such construction, because injured in fact, but that three *conservation groups* of the same area, whose outdoor programs promoted use of the very recreational facilities, were not injured in fact and, hence, had no standing. It relied upon *Alameda Conservation Ass'n.*

In *Ballerina,* the Court was confronted with a challenge to an administrative action by a corporation, Ballerina Pen Company and some of its employees, on behalf of all blind employees who would be discharged if its contract was peremptorily terminated by a new agency regulation. According to that case, the test for standing, where administrative action is challenged, "even in the absence of [a] specific 'person aggrieved' ", is a three-part test wherein the party must allege (1) that the challenged action has caused him injury in fact in order to meet Constitutional "adverseness"; (2) that the agency has acted arbitrarily, capriciously, or in excess of its statutory authority so as to injure an interest that is "arguably within the zone of interests" sought to be protected by statute or constitution; and (3) that there is no "clear and convincing" showing that judicial review was intended to be withheld by the legislature. (*Ballerina,* 433 F.2d at p. 1207). See Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970) a prior opinion of this same Court.

We do not share the fear of some earlier decisions that liberalized concepts of "standing to sue" will flood the Courts with litigation. However, if that should be the price for the preservation and protection of our natural resources and environment against uncoordinated or irresponsible conduct, so be it. But such seems most improbable. Courts can always control the obviously frivolous suitor. See: Crescent Park Tenants Assoc. v. Realty Equities Corp of N. Y., 58 N.J. 98, 275 A.2d 433 (1971), for an excellent opinion by Justice Jacobs of the New Jersey Supreme Court. The better view, we think, in approaching the vexatious problems confronting the Court's endeavor to give effect to National and State environmental legislation, is the maintenance of a sensitive balance between the continuing march of technicological advance and preservation of our natural resources. This view is espoused and comprehensively discussed in an outstanding article entitled An Environmental Bill of Rights: The Citizen Suit and The National Environmental Policy Act of 1969, 24 Rutgers Law Review 230 (1970). The authors, Professor Eva H. Hanks of Rutgers University and Professor John L. Hanks, Associate in Law at Columbia University, here make a distinct contribution in their review of the issue of "standing to sue." The following observations seem most pertinent:

"In the past, we have often accepted the non sequitur that where all are the intended beneficiaries of an interest, none has standing to protect it. The dangers inherent in this philosophy are now apparent: Both logic and experience support the emerging view that an interest so fundamental that all are within the protected class must be permitted its champion. The National Environmental Policy Act has created such an interest" (p. 248).

"In the past, economic considerations have carried the day. The Environmental Policy Act meant to throw a new value into the scales—an ethical one. More specifically, an 'ecological ethic of understanding and respect for the bonds that unite the species man with the natural systems of the planet.' 'It is an ethic whose yardstick for progress should be: Is it good for people?' What is 'good for people' is often difficult to say. But a consensus seems to be emerging which would have us: reject any notion that progress means destroying Everglades National Park with massive airport development * * * or that it is progress to fill hundreds of square miles of our bays and coastal wetlands, destroying natural habitat for thousands of species of fish and wildlife, polluting our waters, and in many other ways wreaking havoc with this fragile ecological system in the name of providing new space for industry, commerce, and subdivisions." (p. 268 and citing 116 Cong.Rec.S. 80, remarks of Senator Nelson, introducing S.J.Res. 169, 91st Cong. 2nd Sess. (1970) proposing an amendment to the U. S. Constitution declaring that every person has an inalienable right to a decent environment and that the United States and every State shall guarantee such right.)

Although prudence may dictate the staying of our hand until disposition is made by the United States Supreme Court of the pending appeal in *Hickel, certiorari* having been granted, the importance of the conflicting interests and the imminence of possible, continuing and irreparable harm to one or the other of the adverse parties, dictates dispatch in the disposition of the present motions. Accordingly, it is the conclusion of this Court that the plaintiff has adequate legal standing to maintain this action; that the complaint states a sufficient cause of action cognizable under the *NEPA* and related *Acts;* and that substantial federal questions are presented.

Defendants' contention that there is no specific damage relatable to this particular plaintiff is answered in *Data Processing,* which points out that injury complained of in this type of case,

while frequently economic, need not be so (397 U.S. at p. 172, 90 S.Ct. 832, 25 L.Ed.2d 192). The plaintiff counters saying that, given the opportunity, it can document substantial damage; it maintains that it has a decided interest to be protected in the New Jersey salt marsh which has been recognized and acknowledged for its famous environmental and ecological values by fish and wildlife biologists.

The theory that associations, although not technically harmed but which have constituencies who are individually and collectively harmed, do nevertheless suffer injury and have "standing" to sue, finds support in Scenic Hudson Preser. Conf. v. Fed. Power Comm'n., 354 F.2d 608 (2 Cir. 1965), cert. den. Consolidated Edison of N. Y. v. Scenic Hudson, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). See also Jaffe, Judicial Control of Administrative Action, 542–543 (1965).

■ The argument made by the defendants that this action should be dismissed because there are available adequate remedies in the New Jersey State Courts ignores duality of jurisdiction. A plaintiff, traditionally, has a choice of forum providing, of course, that jurisdiction is properly invoked and process effected as it has been in this case.

The plaintiff's standing extends representatively also to the class which it purports to represent, under Rule 23(b) (2), F.R.Civ.P. The members of that class are so numerous, in being and in generations yet unborn, as to make it not only impracticable but impossible to bring them all before the Court, and with respect to whom there are substantial and common questions of fact and law.

■ In disposition of the affirmative defense asserted by both the Federal and State defendants of a cloak of

sovereign immunity, such defense lacks persuasion when gauged against the paramount national interest as expressed in the *NEPA*. As pertinently stated in Izaak Walton League of America v. St. Clair, supra, 313 F.Supp. at pp. 1315–1316:

> "Certainly the relief sought by the plaintiff is not 'an intolerable burden' on governmental functions if granted and would seem to fall within the well-established exception to the sovereign immunity doctrine relating to an allegation that government officials are exceeding their statutory powers. The court presently does not pass on the merits of this question but does believe that the merits should be considered and not be barred at this preliminary stage by the doctrine of sovereign immunity, giving due consideration also to the Administrative Procedure Act, 5 U.S.C. §§ 701–706." [10]

See also, Rule 17(b) F.R.Civ.P., 28 U.S.C., pertaining to the capacity to sue or be sued.[11] Whether federal or state administrative agents are immune from suit in the federal courts for an alleged violation of federal law, is a question of federal, rather than state law. Elliot v. Volpe, 328 F.Supp. 831, (D.C.Mass. 1971). In the absence of a "persuasive reason to believe" that review of agency action was foreclosed by Congress, we must presume aggrieved persons are entitled to review administrative actions be they state or federal. City of Chicago v. United States, 396 U.S. 162, 164, 90 S.Ct. 309, 24 L.Ed.2d 340 (1969). The early doctrine of sovereign immunity was based upon the ancient adage that "the King can do no wrong," thus providing immunity to the sovereign from suit. Such an unrealistic and absolute immunity in present day ambience has wisely been judicially and

10. Providing for judicial review of administrative agency action.

11. Rule 17(b) "The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of his

domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held * * *"

legislatively[12] eroded in New Jersey, among other states. See: Fitzgerald v. Palmer, 47 N.J. 106, 219 A.2d 512 (1966), P. T. & L. Construction Co. v. Com'r. Dept. of Transp., 55 N.J. 341, 262 A.2d 195 (1970) and Willis v. Dept. of Conservation & Economic Development, 55 N.J. 534, 264 A.2d 34. It is the holding of this Court, particularly in light of the coordination of administrative agencies under *NEPA,* that both federal and state officials are subject to suit for allegedly exceeding their statutory authority. This approach is the modern trend. Cahn & Cahn, The New Sovereign Immunity, 81 Harv.L.Rev. 929 (1968). See also Scanwell and Delaware v. Penn Central.

 Turning to defendants' contention that plaintiff's action improperly invades or interferes with State riparian rights, this is a premature consideration and ignores the fundamental compatibility of interests of both the State and Federal Governments which, by definition, is designed to promote and protect the general as well as the individual welfare of all men. It is "survival" about which we speak when we discuss the ecological impact of man's activities in this supersonic age and not technical, hair-line, provincial differences between State and Federal interests.

 Nor is "abstention" indicated, as argued by the defendants. On the contrary, judicial dispatch and federal, rather than parochial, considerations under *NEPA* are demanded. What course the merits might ultimately dictate is quite another matter.

 Moreover, the defendants' assertion that this action is barred by the doctrine of "laches" ignores the plaintiff's demand for a declaratory judgment with respect to a continuing offense and, as well, a prospective one

involving the environment so recently by legislation made vividly important to us all. Furthermore, mere lapse of time without a showing of prejudice to an adversary is not sufficient to constitute laches. Sobosle v. U. S. Steel Corp., 359 F.2d 7 (3 Cir. 1966); Ritter v. Rohm & Haas Co., 271 F.Supp. 313 (S.D.N.Y. 1967). The complaint in this matter was filed within less than 8 months of the effective date of the *NEPA,* demonstrating dispatch rather than delay. And obviously, plaintiff was aware of the line of cases, prior to the recent *Act,* denying standing to conservationist groups.

 This case does not present, as urged, a "political question," except in the sense, perhaps, that it affects the entire body politic. It does not request an advisory opinion on an abstract problem; the plaintiff is not a mere debating society. The issues presented reach into the well-springs of our natural resources held in governmental trust for the benefit of mankind. Our environment must be protected against abuse, either public or private. That is the mandate of Congress. Irresponsible annihilation of nature's creatures, our natural resources and man himself, present the antithesis of the salutary objectives sought to be achieved by the *NEPA.* As President Nixon, so aptly put it:

"We need new knowledge, new perceptions, new attitudes—and these must extend to all levels of government and throughout the private sector as well: to industry; to the professions; to each individual citizen in his job and in his home. We must seek nothing less than a basic reform in the way our society looks at problems and makes decisions * * * It is also vital that our entire society develop a new understanding and a new awareness of man's relation to this environment—what

---

12. P.L.1970, ch. 98: "Except for actions founded upon the Constitution of this State or the United States or an express provision of the statutory laws of this State, no action shall be instituted or continued against the State or any department or other agency thereof for the recovery of money damages, whether based on contract or tort, where the cause of action accrues prior to July 1, 1971."

might be called 'environmental literacy'." [13]

Ecological problems are of such magnitude that they have assumed international proportions. This was brought into sharp perspective recently by the following timely article:

"From Nice to Naples the once-celebrated blue of the Tyrrhenian Sea, which gave the Cote d'Azur its name, is changing into a dull grey * * * Huge numbers of dead fish have indeed been floating down the Tiber into the sea in recent days, victims of a yet unexplained ecological catastrophe * * * Millions of pine trees in coastal groves from the Riviera to Calabria are sick with a mysterious disease * * * In the face of alarm spreading among the local population and tourists, ecologists from France, Italy and the principality of Monaco met last week in Nice to discuss what could be done. They agreed that what was needed was not new legislation to halt further pollution of the Mediterranean and clean up the soiled sea but the will to enforce the existing laws." (Paul Hofmann in the N. Y. Times, May 23, 1971.)

The "London Times," as well, recently saluted an environmental victory when John Davies, Secretary for Trade and Industry announced in the House of Commons that environment and planning are "of paramount importance" in these words:

"The victory of the third airport [to be built at Foulness Island in the Thames estuary 50 miles east of London at an extra cost of $360 million, rather than in Aylesbury and surrounding villages chosen by engineers] suggests that the values of civilization are beginning again, after nearly two centuries, to displace the arguments of the engineer. Foulness may indeed be a silly place to put an airport, but it is not a disgraceful place to site an airport. The saving of the countryside north of London was an admirable example of voluntary work."

It is determined that the plaintiff, its members, and the class on behalf of whom this action was brought, have special beneficial interests which are subject to injury and damage and which are within the "zone of interests" sought to be protected by National legislation, particularly *NEPA*. The broad interests sought to be protected by the plaintiff are entirely too comprehensive and by far too important to be personalized and limited by traditional and familiar tort injury concepts. In the new environmental context, it is the many rather than the few who are envisioned by protective legislation. If the Sea is soiled, if the Sky is adulterated with germ-producing emphysema, if the Land is sullied and its produce diseased, all must suffer. Pollution directly and imminently affects our very food supply and its extensive commercial enterprises. Purity of fish products is crucial. Swordfish has been practically banned, because of mercury pollution, and tuna is suspect. We are not confronted with an isolated discharge of an industrial detergent into the Mississippi Delta or a pop bottle in the Delaware River, rather, we are concerned with the interests of the Commonweal. As the poet says, "No Man is an Island," and with respect to environmental balance the bell is now tolling for us all and sounds the alarm for the imposition of corrective measures and for correlative judicial enforcement.

It is inconceivable that Congress, in order to halt the pollution of a trout stream, bestowed legal standing solely upon the casual, meditating fisherman standing knee-deep in his waders, rod in hand, hopefully casting his fly, but to his utter despair witnessing the debacle of dead trout surfacing the stream. Nor, were seemingly meddlesome groups made the repositories of the Public Trust

---

13. President Nixon's letter of transmittal for the first Annual Report of the Council on Environmental Quality to the Congress. Federal Bar News, vol. 18 no. 4 (April, 1971), Overview—first chapter of "Pollution and the Law."

for unborn generations. The Izaak Walton League certainly falls within neither category. It is not, as so colorfully characterized by its counsel, a group of little old ladies in tennis shoes championing the rights of the birds. The League is a public spirited group dedicated to the task of seeking enforcement of the legislative intent. The Congressional intent is clear. The judicial function is to give force to the avowed legislative purpose and nowhere in the *Acts* is there any intimation that judicial review of administrative action is foreclosed. City of Chicago v. United States, supra; Admin. Proced. Act, supra. And if a Society such as the Walton League, aside from a governmental agency, is powerless to invoke the benefit of such legislation, then who can?

In closing, a final observation seems appropriate. At one end of the spectrum of human values lies the resurgence of ecological demands; at the other, the understandable reluctance to retard technological progress. The one case nostalgically prompts a return to the pristine beauty of Thoreau's "Walden's Pond"—the other encourages a continuation of Einstein's Atomic expansion with unbridled ecological impact. In one instance, the idyllic existence of a "Robinson Crusoe"—in the other, the horror evoked by a "Frankenstein." Our survival lies somewhere in between these extremes without doing violence to the causes and champions of either. Surely, there is an equipoise which does not unduly impede our scientific advancement nor accelerate the destruction of our environment. There is a necessary balance, dependent upon the circumstances of a particular case, which lies between reasonable use and destructive abuse. Its ascertainment in this case, of course, must await a judicial determination upon the merits.

Accordingly, the defendants' motions to dismiss the complaint will be denied and an Order shall be entered herewith.