LAKE ERIE ALLIANCE FOR the PROTECTION OF the COASTAL CORRIDOR et al., Plaintiffs,

v.

UNITED STATES ARMY CORPS OF ENGINEERS et al., Defendants.

Civ. A. No. 79–110B Erie.

United States District Court, W. D. Pennsylvania.

March 18, 1980.

Michael J. Healey, Thomas J. Kennedy, Pittsburgh, Pa., Staughton Lynd, Youngstown, Ohio, James B. Callen, Youngstown, Ohio, Douglas L. Kohout, Cleveland Heights, Ohio, James A. Denney, Youngstown, Ohio, for plaintiffs.

Craig R. McKay, Asst. U. S. Atty., Pittsburgh, Pa., Peter D. Coppelman, Dept. of Justice Lands and Natural Resources Division, Washington, D. C., H. Frank Parson, Asst. Dist. Counsel, U. S. Army Engineer Dist. Buffalo, Buffalo, N. Y., for defendants.

## MEMORANDUM OPINION

KNOX, District Judge.

This is an action brought by numerous individuals and organizations against the United States Army Corps of Engineers, the Secretary of the Army and other federal officials challenging the sufficiency of an Environmental Impact Statement (EIS) issued by defendants in connection with the proposed construction of a complex steel producing facility by United States Steel (USS) in Conneaut, Ohio. Jurisdiction is properly invoked under 42 U.S.C. § 4332.

Presently before the court is the federal defendants' motion to dismiss the following plaintiffs for lack of standing and for failure to state a claim pursuant to Fed.R.Civ. Proc. 12(b)(6): Lake Erie Alliance for the Protection of the Coastal Corridor (LEA); George E. Limberty; John McNicol; Locals # 1330, # 1397 and # 1462 of the United Steelworkers of America; and the Tri-State Conference on the Impact of Steel on Ohio-Pennsylvania-West Virginia.

### A. Standing

To obtain judicial review of agency action under section 10 of the Administrative Procedure Act of 1946 (APA), § 702, 5 U.S.C. § 551 et seq. (1970), plaintiffs must satisfy two requirements. First, they must demonstrate a case or controversy within the meaning of article III of the United States Constitution by showing injury in fact, economic or otherwise, as a result of agency action. Second, they must be persons adversely affected or aggrieved by agency action within the meaning of the relevant statute, that is, the interests they seek to protect must be arguably within the zone of interests to be protected by the act. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

Whether or not a plaintiff meets the test for standing must be determined by the pleadings alone. *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254

(1973); *Paton v. La Prade,* 524 F.2d 862 (3d Cir. 1975). The voluminous complaint and amended complaint filed by the plaintiffs in this action include numerous allegations of agency impropriety in which all plaintiffs allege each and every cause of action. This places the burden on the court to scrutinize the actual, as well as the professed, interests of each plaintiff challenged in the defendants' motion. For organizational purposes, the standing of LEA will be considered first, the "steelworkers," consisting of Limberty, McNicol and the three local unions, will be analyzed together, and the Tri-State Conference will be considered last.

(1) Lake Erie Alliance (LEA)

Plaintiff LEA is defined in the complaint as:

> . . . [a] non-profit, public benefit membership corporation organized under the laws of the State of Ohio. Its membership includes persons and organizations situated in or near Lake Erie and the area affected by this project, who depend on the Lake and its coastal corridor for fishing, swimming, navigation, and drinking, as well as for livelihood, recreation, and general well being, and who need and appreciate its aesthetic and cultural value. LEA's members are residents and citizens of the States of Ohio, Pennsylvania and New York in the United States, and of the Province of Ontario in Canada. Many of LEA members live downwind from the proposed facility and are dependent on the land affected by the project for their livelihood.

Plaintiffs allege that the failure of the defendants to adequately and properly consider all relevant factors before issuing the EIS will cause irreparable damage to Lake Erie, its coastal corridor, neighboring streams and nearby agricultural areas from air and water pollution. Plaintiffs also allege that a large scale reconstruction project in the Conneaut Harbor area will disrupt, and possibly destroy a unique ecosystem currently flourishing there, and have a generally severe impact on the quality of air, water, lands and wildlife in the region.

The seminal act in this case is the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.* Section 101(a) of NEPA describes the national environmental policy as follows:

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this Act, . . . it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or

other undesirable and unintended consequences,

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice.

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities, and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment. Personally felt aesthetic or conservational harm is sufficient to confer standing, *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972), *United States v. SCRAP*, 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973), and plaintiffs have so alleged with specificity. Further, a non-profit, public benefit corporation whose purposes include the protection of the environment or the lives, health or property of persons or animals, qualify as persons "adversely affected" under the APA. *Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608 (2d Cir. 1965), cert. den. 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966); *Powelton Civic Home Owners Assn. v. Dept. of HUD*, 284 F.Supp. 809 (E.D.Pa.1969); *Cape May County Chapter, Inc. of Izaak Walton League v. Macchia*, 329 F.Supp. 504 (D.N.J.1971). LEA, with all of its members residing in the area involved, appears to be the ideal plaintiff contemplated by NEPA to ensure agency compliance with its mandates and therefore we find that it does have standing.

(2) The Steelworkers

Plaintiffs Limberty and McNicol, individual steelworkers who reside in the Youngstown area, were terminated along with 400 others when Lykes Corporation partially shut down its Campbell Works in 1977.

Local # 1330 represents USS steelworkers in Youngstown, Ohio, Local # 1397 represents USS steelworkers in Homestead, Pennsylvania, and Local # 1462 represents steelworkers at the Jones and Laughlin Brier Hill Works in Youngstown. The unions allege that their members are threatened with unemployment as a direct result of shutdowns which will result if the new facility at Conneaut is built. All steelworker plaintiffs have expressed an interest in finding an alternate site for the proposed plant, and have alleged that defendants failed to comply with NEPA in their rejection of proposed alternatives.

■ Defendants contend that there is no evidence that any steelworker has been or will be unemployed as a result of the proposed Conneaut project. However, plaintiffs correctly point out that the determination of standing must be tested by the pleadings, which are to be taken as true, and not by the merits of the allegations unless they can be shown to be "mere shams." *Paton v. La Prade, supra*, at 867; *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Further, it is sufficient under the first prong of the standing test for plaintiffs to allege "threatened" economic injury as a result of agency action. *Linda R. S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

In *Shiffler v. Schlesinger*, 548 F.2d 96 (3d Cir. 1979), the Third Circuit Court of Appeals held that threatened job termination qualifies as economic injury under the APA. In that case, an individual employee and several unions challenged the failure of the Department of Defense (DOD) to issue an EIS in conjunction with a decision to consolidate a major component of the Army Signal School with another school where new facilities were being constructed. Shiffler, a civilian employee threatened with job loss, was found to have standing under NEPA.

The gravamen of Shiffler's complaint is that the realignment will result in large scale unemployment and population loss in the area surrounding Fort Monmouth

which will produce 'severe environmental and socioeconomic effects on plaintiffs' community and quality of life.' Plaintiff Shiffler, as a resident of the area, satisfies the injury in fact requirement because personally felt esthetic or conservation harm is sufficient to confer article III standing. (citations omitted). 548 F.2d at 102.

The court also held that the individual employee satisfied the second prong of the standing test since he lived in the area affected by the agency decision and combined allegations of economic injury with ecological ones.

The court was also faced with the question of whether unions have standing to bring suit under NEPA in *Shiffler* and determined that they did satisfy the first prong.

> The Union's interest is to promote the welfare of its members concerning employment matters. The dislocation, forced early retirement and grade reduction facing its members is economic injury to the members from which the Union may seek relief in a representative capacity. Although the claims it presses are environmental, the economic injury to its members qualifies as injury in fact. (citations omitted). *Id.*

Since the case was disposed of on the grounds of laches, the court specifically left open the question of whether the union's interest in loss of employment was arguably within the zone of interests to be protected by NEPA. In a footnote, the court stated the government's position that, while unemployment and population loss should be included in an EIS, they are only secondary socioeconomic impacts and insufficient alone to confer standing. Without indicating approval or disapproval of the government's position, the court cited two cases in the footnote, one which would seem to support the government's position, and one which directly refutes it. *Id.* at 103, n. 3.

In the case cited as supporting the view that employment is not an interest arguably within the scope of NEPA, four state congressmen, two U. S. senators, two coun-

ty judges and the city of Lexington brought suit to force the DOD to prepare an EIS in conjunction with its decision to close an army base. *Breckinridge et al. v. Rumsfeld*, 537 F.2d 864 (6th Cir. 1976). As a result of the Army's decision to close the base, 18 military and 2630 civilian jobs would be eliminated in the Lexington area. The court determined that there would be no long term impact, no permanent commitment of a national resource and no degradation of a traditional environmental asset, but rather only short term, personal inconveniences and economic disruptions. The court stated that it was "not the [purpose or] intention of Congress for NEPA to be used for purposes of promoting full employment or to prevent the discharge [and] transfer of federal personnel." 537 F.2d at 865. The court went on to state that although factors other than physical environment have been considered under NEPA, "this has been done only when there existed a primary impact on the physical environment." 537 F.2d at 866.

In *McDowell v. Schlesinger*, 404 F.Supp. 221 (W.D.Mo.1975), also cited in *Shiffler v. Schlesinger, supra*, the union representing the civilian air force employees sued the DOD for failing to comply with NEPA. The court rejected the government's argument that the union lacked standing because secondary social and economic impacts, as contrasted to direct impacts on the ecology, do not fall within NEPA's ambit. Following a lengthy discussion of NEPA policies, DOD regulations, Council on Environmental Quality (CEQ) Guidelines and existing case law, the district court held that NEPA's broad policy considerations encompass more than direct ecological impacts and could "arguably" be extended to the interests represented by the union. 404 F.Supp. at 244–246. In *Jackson County, Missouri v. Jones*, 571 F.2d 1004 (8th Cir. 1978), the standing of the union was not challenged, but the Eighth Circuit cited *McDowell v. Schlesinger, supra*, with approval and specifically enumerated unemployment and job loss as one factor to be considered in deciding whether an EIS was properly compiled. 571 F.2d at 1014.

A District of Columbia district court was the only other court to specifically face a challenge to the right of employees to bring suit under NEPA to protect their jobs. In *Prince George's County, Maryland v. Holloway*, 404 F.Supp. 1181 (D.D.C.1975), employees of a naval oceanographic program were found to have standing to challenge the sufficiency of an EIS prepared in connection with the consolidation and transfer of the program to a new site. Without elaboration, the court held that being forced to choose between job loss and relocation as a result of agency action constituted injury in fact, and because the concern of the employees "clearly extends to environmental considerations," they were found to have an interest covered by NEPA. 404 F.Supp. at 1185.

Other circuits have considered whether private plaintiffs should be granted standing under NEPA to advance their own economic interests, and have concluded that while NEPA does not encompass monetary interests alone, *Zlotnick v. Redevelopment Land Agency*, 161 U.S.App.D.C. 238, 494 F.2d 1157 (D.C.Cir.1972), a party is not precluded from asserting cognizable injuries to environmental values because his "real" or "obvious" interest may be viewed as monetary. *Realty Income Trust v. Eckerd*, 183 U.S.App.D.C. 426, 431, 564 F.2d 447, 452 (D.C.Cir.1977); *Township of Dover v. U.S. Postal Service*, 429 F.Supp. 295 (D.N.J. 1977). As long as the environmental concerns are not so insignificant that they ought to be disregarded altogether, courts generally do not disqualify a plaintiff from asserting a legal claim under NEPA because the impetus behind it may be economic. Otherwise, the broad congressional purposes of the Act to ensure that economic values are adequately protected would be defeated. *Robinson v. Knebel*, 550 F.2d 422 (8th Cir. 1976); *Realty Income Trust, supra.*

The Ninth Circuit Court of Appeals recently faced a case in which a major city and a private broadcasting station brought suit to prevent the transfer of an aluminum reduction plant from Clatsop County to Umatilla County in Oregon. *Port of Astoria, Oregon v. Hodel*, 595 F.2d 467 (9th Cir.

1979). The city, located in Clatsop County, was concerned with the loss of revenue which would result from the transfer and was denied standing, while the radio station in Umatilla, concerned that the plant would cause interference with its broadcasting, was granted standing. The court distinguished between economic injuries caused solely by the decision to relocate the plant, and those which were the direct and immediate result of building the plant. The building of the plant, as opposed to the mere decision to relocate, was an act which would have a primary impact on the natural environment, which was a concern the radio station in the environmentally affected county shared with NEPA.

■ In accord with this broad interpretation of interests to be advanced under NEPA is *Mobil Oil Corp. v. FTC*, 430 F.Supp. 855 (S.D.N.Y.1977), in which five major oil companies were found to have standing to challenge the FTC's institution of enforcement proceedings against them without first preparing an EIS. The oil companies included among their allegations a concern for damage to the environment, and this was found to be sufficient to grant them standing. In *National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir. 1971), cited with approval in *Chemical Leaman Tank Lines, Inc. v. U. S.*, 368 F.Supp. 925, 947 (D.Del.1973), standing was upheld for a private corporation seeking judicial review of an agency's cancellation of a helium conservation contract. The court stated:

We are unable to say that the companies are motivated solely by protection of their own pecuniary interest and that the public interest aspect is so infinitesimal that it ought to be disregarded altogether. It is not part of our function to weigh or proportion these conflicting interests. Nor are we called upon to determine whether persons seeking to advance the public interest are indeed conscientious and sincere in their efforts. True, the plaintiffs are not primarily devoted to ecological improvement, but they are not disqualified on this account from seeking

to advance such an interest. No group has a monopoly on working for the public good. 455 F.2d at 655.

To support its motion to dismiss, the government inappropriately relies on decisions from other circuits denying standing to plaintiffs who alleged *solely* economic interests or who were unaffected in any way by the detrimental environmental effects of the proposed action. While the "real" interest of the steelworkers before us is undoubtedly in job security, all live in or around the tri-state area which will be affected environmentally by this project, and all have alleged a *concern* with those adverse environmental effects. This case is factually distinguishable from *Breckinridge v. Rumsfeld, supra,* where the court found that there would be *only* secondary socio-economic effects felt as a result of the proposed agency action. *Breckinridge* actually supports the proposition that where agency action will have primarily environmental effects, then secondary socio-economic effects, including effects on unemployment, should be considered.

NEPA and the CEQ Guidelines indicate that the sweep of NEPA is broad and support the conclusion that it reaches secondary effects, "which may often be more substantial than the primary effects of the original action itself." 40 C.F.R. § 1500.8 (1973). The question then narrows into whether the interests represented by the unions fall within those secondary effects.

Specifically listed as factors to be considered under the Act in conjunction with the preparation of an EIS on "major Federal actions significantly affecting the quality of human environment" are:

(i) environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(C).

These factors have been described in the agency regulations to include population and growth impacts and an assessment of the effects of any possible change in population patterns upon the resource base. 40 C.F.R. § 1500.8(3)(ii) (1973).

The Army Corps of Engineers has responsibility for issuing permits for projects that would interfere with the navigable capacity of a waterway and is bound to adhere to the stated policies of NEPA and the CEQ Guidelines in preparing an EIS and issuing a permit. 33 C.F.R. § 209.410(a). The Corps promulgated its own regulations to follow in addition to those of NEPA, which requires its officials to study a project from an environmental standpoint, but to include "engineering, economic, social and other considerations to insure balanced decision making in the total public interest." 33 C.F.R. § 209.410(d)(ii) (1973).

There is no question that the proposed project in the Conneaut, area, will primarily affect the environment, and plaintiffs have so alleged with great detail. In conjunction with these allegations, the steelworker plaintiffs, among others, have raised a concern for the secondary effects that this project will have on unemployment, a problem which decidedly extends into the realm of "public interest." In fact, the defendants took into consideration the massive unemployment which could result if one of the proposed alternative sites was chosen and cited this as one of the reasons for rejecting them. We therefore find that the policies of NEPA, to coordinate the conditions under which "man and nature can exist in productive harmony" and "to achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities" are broad enough to encompass the interests represented by the steelworkers.

(3) The Tri-State Conference on the Impact of Steel in Ohio-Pa-West Virginia

This group is defined in the complaint as an "unincorporated association convened by Bishop Robert Appleyard, Episcopal Bishop of Pittsburgh, in cooperation with the Interfaith Center on Corporate Responsibility," and its described purpose is to "examine the human suffering and community disintegration caused by recent and prospective steel mill shutdowns." The members of this group live and work in the tri-state area which will be affected by the proposed steel facility. In addition to the concerns shared by the steelworkers facing job loss or transfer, the Tri-State Conference voices an additional concern with the accompanying blight and deterioration that such unemployment will have on the surrounding steel communities.

We believe that this is also an interest which is arguably within the scope of NEPA and therefore find that they have standing to challenge the EIS issued by the Army Corps of Engineers.

B. Motion to Dismiss under Fed.R.Civ. Proc. 12(b)(6)

Defendants have moved to dismiss the complaint in this case pursuant to Rule 12(b)(6) of the Fed.R.Civ.Proc. on the grounds that it fails to state a claim upon which relief can be granted. In considering a 12(b)(6) motion, the allegations of the complaint must be accepted as true. *U. S. v. Mississippi*, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965); *Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139 (3d Cir. 1973). The complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Sherwin v. Oil City National Bank*, 18 F.R.D. 188 (W.D.Pa.1955), *aff'd*, 229 F.2d 835 (3d Cir. 1955).

In this case, plaintiffs have combined numerous allegations of failures by the defendants to comply with, *inter alia*, NEPA, the APA, and the Clean Water Act,

33 U.S.C. § 1341(a), and while several of the allegations may be difficult to prove, the complaint in its entirety is more than sufficient to withstand a motion to dismiss pursuant to Rule 12(b)(6).

We therefore deny defendants motion to dismiss for lack of standing or for failure to state a claim upon which relief can be granted. An appropriate order will be entered.