ENVIRONMENTAL DEFENSE FUND et al., Plaintiffs-Appellees,

v.

TENNESSEE VALLEY AUTHORITY et al., Defendants-Appellants.

No. 72-1138.

United States Court of Appeals, Sixth Circuit.

Dec. 13, 1972.

Thomas A. Pedersen, Knoxville, Tenn., for defendants-appellants; Robert H. Marquis, Beauchamp E. Brogan, Justin M. Schwamm, T. V. A., Division of Law, Knoxville, Tenn., on brief.

Jon T. Brown, Washington, D. C., for plaintiffs-appellees; Wallace L. Duncan, Arthur J. Gajarsa, Washington, D. C., on brief; Edward Lee Rogers, East Setauket, N. Y., Lawrence R. Reno, Denver, Colo., of counsel.

Before WEICK, McCREE and MILLER, Circuit Judges.

McCREE, Circuit Judge.

We consider the validity of a preliminary injunction issued against the Tennessee Valley Authority (TVA) and its officers and agents at the behest of three organizations and an individual asserting that they will be irreparably harmed if the TVA continues construction of the Tellico Project on the Little Tennessee River without filing the environmental impact statement specified in section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C.A. § 4332(2)(C).[1] We con-

---

1. Title I of the NEPA, 42 U.S.C. §§ 4321–35 (1970), provides:

§ 4321. Congressional declaration of purpose

The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Enviromental Quality.

§ 4331. Congressional declaration of national environmental policy.

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsi-

clude that the injunction properly issued.

bility to contribute to the preservation and enhancement of the environment.

§ *4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts*

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent, with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by subchapter II of this chapter.

§ *4333. Conformity of administrative procedures to national environmental policy*

All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.

§ *4334. Other statutory obligations of agencies*

Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the rec-

The Tellico Project is described in the opinion of the District Court, 339 F.

Supp. 806 (E.D.Tenn.1972), and we will therefore summarize only the facts pertinent to the issues presented in this appeal.[2]

The Little Tennessee River rises in the mountains of western North Carolina and flows northwesterly to its confluence with the Tennessee River in eastern Tennessee. On the Tennessee, just north of the mouth of the Little Tennessee, is the Fort Loudon Dam and Reservoir. The Tellico Project involves the construction of a dam on the Little Tennessee below its mouth. The dam is to be an earth embankment with a concrete spillway, and when it is operational (in 1975), it will impound the Little Tennessee and create a reservoir 33 miles long. In lieu of a navigation lock, an 850-foot-long navigation canal will connect the Tellico Reservoir with the Fort Loudon Reservoir. And, a nine-foot-wide navigable channel will extend 30 miles up the Little Tennessee from the Tellico Dam to a point three miles downriver from the existing Chilhowee Dam. TVA will acquire 38,000 acres of land for the project, of which 16,000 acres of Little Tennessee bottomland will be inundated by the reservoir, including 2,100 acres of the present river bed.

The purpose of the project is to foster the economic development of the three Tennessee counties through which the Little Tennessee flows. TVA has estimated that the commercial water transportation to be provided by the 30-mile channel will result in private investment of $265 million in new commercial enterprise in the Tellico area over the next 25 years and the concomitant creation of 6,600 new jobs. It also asserts that the project will provide additional flood control, electric power, and recreation in the area. Further, a planned community of 50,000 people is envisioned for the area. At the project's inception, TVA placed the benefit-cost ratio at 1.4:1.

The District Court found that the free-flowing stretch of the Little Tennessee to be impounded "is acknowledged to be the largest and best trout fishing water east of the Mississippi River." 339 F.Supp. at 808. There are several sites of major historical and archaeological significance along the banks and bottomland of the Little Tennessee, such as Fort Loudon, which was built by the English in 1756, and former Cherokee Indian villages that include the ancient capital of the Cherokee nation. The District Court found that "[t]hese archeological stores are virtually untapped."[3] The court further found

ommendations or certification of any other Federal or State agency.

§ 4335. *Efforts supplemental to existing authorizations*

The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of Federal agencies.

2. For a more detailed description of the history and scope of the project and of the benefits and costs expected to accrue therefrom, see the testimony of TVA Chairman Aubrey Wagner, in Hearings Before a Subcomm. of the House Comm. on Appropriations, 89th Cong., 2d Sess., pt. 2, at 697, 761–66 (1966).

3. It should be observed that it was apparently not until the approval of the Tellico Project that any organized attempt was made to explore these sites. Beginning in 1967, systematic archaeological investigation of the area was undertaken, in

part with funds provided by TVA in 1969 and again this year. A key member of the team conducting this investigation, which is being carried out primarily under the auspices of the University of Tennessee, stated in an affidavit introduced by defendants at the hearing that by the time of the closing of the Tellico Dam, the team "will have recovered a fair and representative collection of historical and archaeological material for future study and evaluation. It would be impractical and imprudent to attempt to salvage all available material at the Tellico project because there are many other areas in Tennessee, and places elsewhere, where such material is found." Affidavit of Dr. Alfred K. Guthe, Professor of Anthropology, University of Tennessee (defendants' exhibit No. 17). Dr. Guthe went on to say:

The Tellico project, and the funds provided as a result of it, has made it pos-

that the river is the "likely habitat" of one or more of seven rare or endangered fish species, that it exists in a pristine state, and that all these benefits will be destroyed by its impoundment, as will much valuable farm land. 339 F.Supp. at 808.

The Congress appropriated the initial funds for the project on October 15, 1966, and the TVA authorized construction on November 8, 1966. The original cost estimate of the project was $42.5 million, and TVA's current figure is $69 million.[4] The project has not been altered in scope or design since its approval, and the Congress has appropriated funds for it in each year since 1966.

The effective date of the NEPA is January 1, 1970. Construction of the Tellico Project began in March 1967, and the concrete portion of the dam was completed in February 1969. In June 1969, the relocation of roads and bridges was begun, and in July 1969 construction of a steel span bridge across the Little Tennessee was commenced in anticipation of the relocation of U.S. Highway 411. By January 1970, 45% of the land needed for the project had been acquired and $19 million had been expended. The project was about one-third completed by that date. By January 1971, the steel span bridge had been completed, and, in November 1971, TVA began excavation work in preparation for constructing the earthfill portion of the dam. By January 1972, the time of the hearing in this case, two-thirds of the required property had been purchased; a total of $29 million had been spent on the project; five to eight miles of new road, of the 30 miles eventually to be relocated, had been constructed; and construction had begun on all major components of the project except the navigation canal.

On June 18, 1971, TVA filed a draft environmental impact statement with the Council on Environmental Quality. This statement was later characterized by the District Court as consisting "almost entirely of unsupported conclusions."[5] 339 F.Supp. at 809. Two months after the statement was filed, this lawsuit was initiated.

Plaintiffs first sued in the United States District Court for the District of Columbia on August 11, 1971. On October 13, 1971, that court dismissed the action without prejudice on the ground of improper venue. Plaintiffs then, on December 2, 1971, filed suit in the Northern District of Alabama, and that

---

sible for us to carry out an orderly and extensive investigation over a period of several years and retrieve a great deal of archaeological and historical material which was unavailable under private ownership and which would have been lost or destroyed through erosion, cultivation, pilferage, natural deterioration, and improper handling by inexperienced persons. Our work is coordinated with TVA to make certain that none of TVA's activities will destroy or damage any archaeological or historical material until we have first had an opportunity to conduct such investigation as we deem appropriate.

TVA has also indicated its intention to preserve the site of Fort Loudon. *See* Hearings, note 2 *supra*. Plaintiffs contend that TVA's plans in this regard are inadequate to preserve the historic value of the fort and will "irreparably damage the natural areas contiguous to the Fort which are essential to preserve the his-

toric and esthetic unity of the area." Plaintiff's Complaint ¶ 13.

4. Plaintiffs contend that, based upon TVA's own documents, the estimated cost is now $80 million.

5. The Court's conclusion was based in part upon the testimony of plaintiffs' witnesses, in part upon the comments of the East Tennessee Development District, a professional organization concerned with fostering the economic development of a 16-county area of eastern Tennessee, and in part upon its own independent evaluation and analysis. 339 F.Supp. at 809.

The court also observed that, following a study of the draft impact statement by Tennessee officials, Tennessee Governor Winfield Dunn wrote a letter to TVA Chairman Wagner on December 7, 1971, in which he stated that, in his opinion, "the interests of the State would be best served if TVA were to discontinue plans to impound the Little Tennessee River." 339 F.Supp. at 809.

court on December 21 transferred the case to the Eastern District of Tennessee pursuant to 28 U.S.C. § 1404(a).

The action was brought against TVA and its chairman, Aubrey J. Wagner, by three organizations and an individual landowner. Jurisdiction of the court was invoked under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1970), and under 28 U.S.C. §§ 1331 (a), 1337 and 1361. The complaint sought declaratory and permanent injunctive relief against the construction of the Tellico Project on the basis of asserted violations of sections 101 and 102 of the NEPA; section 9a of the TVA Act, 16 U.S.C. § 831h–1 (1970); 33 U.S.C. § 701a (1970); 16 U.S.C. § 469a (1970); the Fifth and Ninth Amendments to the Constitution; and the federal common law relating to the public trust doctrine. On January 3, 1972, plaintiffs moved for a preliminary injunction against any further construction activity on the Tellico Project until defendants should have filed an adequate environmental impact statement. A hearing was held on this motion on January 7 and 10, 1972, in which both sides presented evidence. At the conclusion of the hearing, the court granted plaintiffs' motion except with respect to defendants' completion of road-building operations that had progressed to the stage at which road-surfacing was necessary to prevent large-scale soil erosion. The court also permitted certain map-making and reporting activities to proceed. Following the denial of defendants' motion to suspend the preliminary injunction pending disposition of their appeal, defendants prosecuted this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1) (1970).

## I

As a preliminary matter, the recent decision of the Supreme Court in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), which was handed down after the District Court issued the preliminary injunction in this case, requires a brief discussion of plaintiffs' standing to maintain this suit. Plaintiffs Trout Unlimited and Association for the Preservation of the Little T have alleged that many of their members have used the Little Tennessee for various purposes and wish to preserve the river to protect its fish, wildlife, surroundings, and water quality. Plaintiff Environmental Defense Fund, although asserting that some of its members live in Tennessee, has not alleged that any of its members have derived personal benefit from the river or have used the river in any way. Plaintiff Thomas Burel Moser has alleged that he is a resident and landowner in the Tellico Project area and that his land is being condemned by TVA for the project. All of the organizational plaintiffs have asserted that they are maintaining this action in pursuit of their organizational objectives and purposes, on behalf of their members, and on behalf of all United States citizens who are interested in the protection and enhancement of our natural environment and resources.

Plaintiffs Trout Unlimited, Association for the Preservation of the Little T, and Thomas Moser have clearly met the standing requirements of section 10 of the Administrative Procedure Act,[6] 5 U.S.C. § 702 (1970), as that section has been interpreted in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S. Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). These plaintiffs have alleged the requisite "injury in fact" that the Court found to be lacking in Sierra Club, supra. And, the injuries they assert are arguably within the zone of interests to be protected by the NEPA. See, e.g., Scherr v. Volpe, 336 F.Supp. 882, 884–885 (W.D.Wis.), mo-

---

6. 5 U.S.C. § 702 (1970) provides:
   A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

tion to suspend injunction denied, 336 F.Supp. 886 (W.D.Wis.1971); Nolop v. Volpe, 333 F.Supp. 1364, 1367 (D.S.D. 1971); Cape May County Chapter, Inc., Izaak Walton League of America v. Macchia, 329 F.Supp. 504, 510–514 (D.N.J. 1971); Sierra Club v. Hardin, 325 F. Supp. 99, 107–112 (D.Alaska 1971). Further, since these plaintiffs satisfy the injury-in-fact test, they may assert the interests of the general public in support of their claims for equitable relief. *Sierra Club, supra,* 405 U.S. at 737–740, 92 S.Ct. 1361 & n. 15. Finally, the two organizational plaintiffs may sue in their own names to vindicate the interests of their members who are injured. *Sierra Club, supra,* 405 U.S. at 739, 92 S.Ct. 1361; West Virginia Highlands Conservancy v. Island Creek Coal Company, 441 F.2d 232, 235 (4th Cir. 1971); Cape May County Chapter, Inc., *supra,* 329 F.Supp. at 514; Upper Pecos Association v. Stans, 328 F.Supp. 332, 333 (D.N.M.), aff'd, 452 F.2d 1233 (10th Cir. 1971), cert. granted, 406 U.S. 944, 92 S. Ct. 2040, 32 L.Ed.2d 330 (1972).

■ However, it does not appear that plaintiff Environmental Defense Fund has satisfied the *Sierra Club* test. Here, as in *Sierra Club,* "[n]owhere in the pleadings or affidavits did the [Fund] state that its members use [the Little Tennessee] for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the [appellants]." *Sierra Club, supra,* 405 U.S. at 735, 92 S.Ct. at 1366. Rather than dismiss Environmental Defense Fund as a plaintiff, however, we leave for the District Court the determination whether the Fund has satisfied the *Sierra Club* test or can do so by amending its pleadings pursuant to Fed.R.Civ.P. 15. *See Sierra Club, supra,* 405 U.S. at 735, n. 8, 92 S.Ct. 1361.

## II

The primary dispute between the parties on this appeal concerns the meaning of the NEPA section 102(2)(C) language "proposals for legislation and oth-er major Federal actions significantly affecting the quality of the human environment . . . ." Appellants contend that no "proposals" have been made with respect to the Tellico Project since the project was initially approved in 1966. In support of this contention, appellants assert what they denominate the "ball of wax" theory. They point out that TVA operates by "force account," meaning that it uses its own personnel and equipment to construct its projects instead of awarding separate contracts for separate phases of the projects. They assert that Tellico is being constructed on this basis; that all aspects of construction are proceeding as a single, unified operation rather than in separate stages; and that the entire project was one-third complete on January 1, 1970. Accordingly, appellants contend that no impact statement is necessary because the project is "one ball of wax," the nature, scope, and design of which have not changed since 1967, and the construction of which began prior to the effective date of the NEPA. They argue that the continuation of work begun prior to the effective date of the NEPA does not make applicable the Act's procedural requirements, and that to apply the NEPA—especially section 102(2) (C)—to Tellico would amount to a prohibited retroactive application of the Act.

Appellees, on the other hand, claim that they are not seeking a retroactive application of the NEPA. They assert that the Act by its terms applies to ongoing federal activities, and that, with respect to the specific wording of section 102(2)(C), every major future action to be taken by a federal agency constitutes a "proposal" until it is consummated. Appellees alternatively argue in favor of the District Court's conclusion that annual requests for appropriations constitute "proposals for legislation" within the meaning of section 102(2)(C).

We conclude that appellants' contentions ignore the language and policy of the NEPA, violate regulations promulgated both by the Council on Environ-

mental Quality and by the TVA itself, and are against the clear weight and trend of the case law that has developed under the Act.

■ In analyzing appellants' contentions, we are not restricted to the bare wording of section 102 of the NEPA. Sections of statutes should not be considered out of context, and in interpreting legislation, courts will examine the entire statute, including its objects and policy. Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1961). "[C]ourts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy." SEC v. C. M. Joiner Leasing Corporation, 320 U.S. 344, 350–351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943). *See also* Cornett-Lewis Coal Company v. Commissioner of Internal Revenue, 141 F.2d 1000, 1004 (6th Cir. 1944).

The NEPA represents the first comprehensive congressional response to the environmental concerns that surfaced so dramatically during the 1960's.[7] As the Senate Committee observed, "[t]he inadequacy of present knowledge, policies, and institutions is reflected in our Nation's history, in our national attitudes, and in our contemporary life. . . . We no longer have the margins for error that we once enjoyed. The ultimate issue posed by shortsighted, conflicting, and often selfish demands and pressures upon the finite resources of the earth are [sic] clear." S.Rep.No.91–296, 91st Cong., 1st Sess. 4 (1969). Consequently, the NEPA was designed "to assure that all Federal agencies plan and work toward meeting the challenge of a better environment." S.Rep.No.91–296, *supra,* at 9, quoted in Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department, 400 U.S. 968, 975, 91 S.Ct. 368, 27 L. Ed.2d 388 (1970) (Douglas, J., dissenting), denying cert. before judgment in 446 F.2d 1013 (5th Cir. 1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L. Ed.2d 136 (1972).[8]

This policy is stated in general terms in section 2 of the Act:

The purposes of this chapter are: To declare a national policy which will

---

7. For examples of more specific, limited legislation directing that environmental factors be considered in the planning of federal programs, see the Federal Aid Highway Act of 1966, 23 U.S.C. § 138 (1970); the Fish and Wildlife Coordination Act, 16 U.S.C. § 662(a) (1970); and the Endangered Species Act, 16 U.S.C. § 668aa(b) (1970). It has been observed that "[i]t is by no means clear, however, that those enactments were not simply displays of 'congressional piety' rather than the recognition or creation of legally protectable interests." Hanks & Hanks, An Environmental Bill of Rights: The Citizens Suit and the National Environmental Policy Act of 1969, 24 Rutgers L.Rev. 230, 247 (1970).

8. President Nixon has recently re-emphasized the need for a major federal role in the implementation of policies and programs to protect the environment:

Primary responsibility for the actions that are needed to protect and enhance our environment rests with State and local government, consumers, industry, and private organizations of various kinds—but the Federal Government must provide leadership. On the first day of this decade I stated that "it is literally now or never" for true quality of life in America. Amid much encouraging evidence that it can and will be "now," we must not slacken our pace but accelerate it. Environmental concern must crystallize into permanent patterns of thought and action. What began as environmental awakening must mature finally into a new and higher environmental way of life. If we flag in our dedication and will, the problems themselves will not go away. Toward keeping the momentum of awareness and action, I pledge my full support and that of this Administration, and I urgently solicit the continuing cooperation of the Congress and the American people.
Special Message to the Congress on Environmental Protection, 1972 U.S.Code Cong. & Admin.News, p. 605 (Feb. 8, 1972).

encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

The remaining sections of Title I of the Act—of which the most important for our purposes are sections 101 and 102— detail the measures to be taken to implement the purposes stated in section 2.

Section 101, as the District of Columbia Circuit has observed in Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112 (1971), declares the Act's basic substantive policies. In section 101(a), Congress

> declares that it is the *continuing policy* of the Federal Government . . . to use all practicable means and measures . . . in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans. [Emphasis added.]

To implement this continuing policy of practicable consideration of environmental values, section 101(b) makes it the "continuing responsibility" of the Government to "use all practicable means . . . to *improve and coordinate* Federal plans, functions, programs, and resources" to accomplish several specified goals, including the preservation of "important historic, cultural, and natural aspects of our national heritage" and the maintenance of "an environment which supports diversity and variety of individual choice." (Emphasis added.)

■ The congressional mandate is clear. Federal officials are to appraise continuously all of their activities not only in terms of strict economic or technological considerations but also with reference to broad environmental concerns. They are to coordinate hitherto separate operations so that undesirable environmental effects may be perceived and minimized. Subject only to the limitation of practicability, they are to strive constantly to improve federal programs to preserve and enhance the environment. In other words, federal officials are required to assume the responsibility that the Congress recognized, in section 101(c) of the NEPA, as the obligation of all citizens: to incorporate the consideration of environmental factors into the decision-making process. *See* Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 836 (D.C.Cir.), dismissed as moot, 337 F.Supp. 170 (D. D.C.1972); National Helium Corporation v. Morton, 455 F.2d 650, 656 (10th Cir. 1971); Scenic Hudson Preservation Conference v. FPC, 453 F.2d 463, 481 (2d Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972); Calvert Cliffs' Coordinating Committee, *supra*, 449 F.2d at 1112– 1115; Kalur v. Resor, 335 F.Supp. 1, 14 (D.D.C.1971); Ex.Ord. No. 11,514, 3 C. F.R. 104 (1971).

■ The procedural requirements of section 102 were designed to assure federal agency consideration of the policies and goals enunciated in section 101. *See* Calvert Cliffs' Coordinating Committee, *supra*, 449 F.2d at 1112; Note, Retroactive Application of the National Environmental Policy Act of 1969, 69 Mich.L.Rev. 732, 734–35 (1971). It contains procedural provisions that are not discretionary; "[i]ndeed, they establish a strict standard of compliance." Calvert Cliffs' Coordinating Committee, *supra*, 449 F.2d at 1112; *see* Kalur v. Resor, 335 F.Supp. 1, 15 (D.D.C.1971); Donovan, The Federal Government and Environmental Control: Administrative Reform on the Executive Level, 12 B.C.

Ind. & Com.L.Rev. 541, 546 n. 16 (1971). Section 102 was drafted following hearings on the bill originally introduced by Senator Jackson. This bill provided that the Secretary of Interior could conduct studies on environmental matters, and it established a Council on Environmental Quality. *See* Hanks & Hanks, An Environmental Bill of Rights: The Citizen Suit and the National Environmental Policy Act of 1969, 24 Rutgers L.Rev. 230, 245 n. 64 (1970). During the hearings on this bill, however, Senator Jackson expressed concern that a mere declaration of policy would not be enough, but that

> realistically what is needed in restructuring the governmental side of this problem is to legislatively create those situations that will bring about an *action-forcing procedure that departments must comply with*. Otherwise, these lofty declarations are nothing more than that.

Hearings on S. 1075, S. 237, and S. 1752 Before the Senate Comm. on Interior and Insular Affairs, 91st Cong., 1st Sess. 116 (1969) (emphasis added), quoted in Hanks & Hanks, *supra*, 24 Rutgers L.Rev. at 252. When the bill was revised by the Senate Committee to include what is now section 102, the Committee report stated that the bill would "provide all agencies and all Federal officials with a legislative mandate and a responsibility to consider the consequences of their actions on the environment. This would be true of the licensing functions of independent agencies as well as the *ongoing activities* of the regular Federal agencies." S.Rep. 91–296, 91st Cong., 1st Sess. 14 (1969) (emphasis added.) *See* Hanks & Hanks, *supra,* 24 Rutgers L.Rev. at 252–53.

Section 102, then, by establishing specific procedures to be followed, makes it possible for courts to determine objectively whether federal officials have carried out the mandate of Congress to accord a high priority to environmental factors. *See* Note, *supra,* 69 Mich.L. Rev. at 735. In section 102(1), Con-

gress "authorizes and directs that, to the *fullest extent possible*," (emphasis added) federal laws and policies shall be interpreted and administered according to the policies set forth in the NEPA. In section 102(2), again "to the fullest extent possible," federal agencies are directed to take specific steps to insure that their decision-making processes conform into the congressional mandate. Among these steps are the utilization of an interdisciplinary approach; the development of procedures by which to quantify environmental values; the preparation and circulation of environmental impact statements; and the development of alternatives to proposed actions involving conflicts concerning alternative uses of available resources.

It will be observed that the only language in section 102 that could conceivably be read as qualifying the specific directives contained therein is the phrase "to the fullest extent possible." However, "this language does not provide an escape hatch for foot dragging agencies; it does not make NEPA's procedural requirements somehow 'discretionary.'" Calvert Cliffs' Coordinating Committee, *supra*, 449 F.2d at 1114. The congressional conference report explained that the purpose of this language was to

> make it clear that each agency of the Federal Government shall comply with the directives set out in such subparagraphs (A) through (H) unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible. If such is found to be the case, then compliance with the particular directive is not immediately required. However, as to other activities of that agency, compliance is required. Thus, it is the intent of the conferees that the provision "to the fullest extent possible" shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in section 102. Rather, the language in section

102 is intended to assure that all agencies of the Federal Government shall comply with the directives set out in said section "to the fullest extent possible" under their statutory authorizations and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance.

Conf.Rep.H.Rep. No. 91–765, 91st Cong., 1st Sess. 9–10 (1969), U.S.Code Cong. & Admin.News p. 2770. Thus, it is apparent that this phrase, rather than qualifying the obligation of federal agencies to comply with the requirements in section 102, constitutes "an injunction to all federal agencies to exert utmost efforts to apply NEPA to their own operations." Ely v. Velde, 451 F.2d 1130, 1138 (4th Cir. 1971). By its terms, then, section 102 exempts agencies from compliance only when other statutory authority under which the agencies are proceeding expressly precludes compliance. See Calvert Cliffs' Coordinating Committee, *supra*, 449 F.2d at 1115; City of New York v. United States, 337 F.Supp. 150, 158 (E.D.N.Y.1972); Hanks & Hanks, *supra*, 24 Rutgers L. Rev. at 254–57; Sive, Some Thoughts of an Environmental Lawyer in the Wilderness of Administrative Law, 70 Col.L. Rev. 612, 648–49 (1970). Accordingly, if the Tellico Project is subject to the NEPA, appellants should not be permitted to rely upon "[c]onsiderations of administrative difficulty, delay or economic cost" to support a claim of exemption. Calvert Cliffs' Coordinating Committee, *supra*, 449 F.2d at 1115.

■ ■ We thus construe section 102(2)(C) in the context of a clearly expressed congressional purpose that federal agencies accord environmental values a high priority in their decision-making processes. When there is doubt about the meaning of a particular statutory term, courts must construe that term to give effect to the intent of Congress. Saxon v. Georgia Association of Independent Insurance Agents, 399 F.2d 1010, 1015 (5th Cir. 1968). Congress'

intent concerning the applicability of the NEPA to ongoing federal projects is most clearly stated in section 101(b), by the terms of which it is apparent that the Congress envisaged ongoing agency attempts to minimize environmental harm caused by the implementation of agency programs. This would encompass not only constant reevaluations of projects already begun to determine whether alterations can be made in existing features or whether there are alternatives to proceeding with the projects as initially planned, but also the consideration of the environmental impact of all *proposed* agency action.

■ ■ To this end, section 102 requires federal agencies to comply with the procedural duties specified therein except when such compliance is precluded by statute. See Donovan, *supra*, 12 B.C.Com. & Ind.L.Rev. at 548. If the term "proposal" in section 102(2)(C) were to be construed as narrowly as appellants suggest, however, then the congressional purpose would often be frustrated. Under appellants' theory, any project the scope and detail of which were finalized before January 1, 1970, and the construction of which is carried on as an integrated whole by the agency itself, would be immune from the requirements of section 102(2)(C). Whether such a project would also be immune from the NEPA's other requirements—a position which appellants also argue—is almost irrelevant since it is apparent that the preparation and circulation of an impact statement is crucial to proper evaluation of environmental factors. *Cf.* Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 833 (D.C.Cir.), dismissed as moot, 337 F.Supp. 170 (D.D.C.1972); Environmental Law Fund v. Volpe, 340 F.Supp. 1328, 1331 (N.D.Cal.1972). Thus, appellants' position regarding the applicability of the NEPA generally to projects begun before January 1, 1970, ignores the mandate to engage in continuous review of federal programs, and their proffered interpretation of the term "proposal" substantially weakens the

Act's effectiveness by making it virtually impossible to update and improve effectively projects begun before the effective date of the Act but not revised since. We believe it more consonant with congressional intent to hold that an agency must file an impact statement whenever the agency intends to take steps that will result in a significant environmental impact, whether or not these steps were planned before January 1, 1970, and whether or not the proposed steps represent simply the last phase of an integrated operation most of which was completed before that date.[9]

Our interpretation of section 102(2)(C) is, we believe, supported by the guidelines issued by the Council on Environmental Quality and by regulations issued by the TVA itself.

The Council's guidelines, which were originally issued on April 30, 1970, and revised on April 23, 1971, indicate the policy of the NEPA to be that "[a]s early as possible and in all cases prior to agency decision concerning major action or recommendation or a favorable report on legislation that significantly affects the environment, Federal agencies will . . . assess in detail the potential environmental impact in order that adverse effects are avoided, and environmental quality is restored or enhanced, to the fullest extent practicable." 36 Fed.Reg. 7724 (1971). The requirements of section 102(2)(C) are stated to apply "to all agencies of the Federal Government with respect to recommendations or favorable reports on proposals for (i) legislation and (ii) other major Federal actions significantly affecting the quality of the human environment." *Id.* The guidelines continue:

(a) "Actions" include but are not limited to:

. . . . . .

(ii) Projects and continuing activities: directly undertaken by Federal agencies. . . .

(b) The statutory clause "major Federal actions significantly affecting the quality of the human environment" is to be construed by agencies with a view to the overall, cumulative impact of the action proposed (and of further actions contemplated)

. . . .

*Id.* That the Council regarded the date of approval or initiation of a project to be unimportant for purposes of fostering the informed decision-making required by the NEPA, and that it rejected the narrow construction of section 102(2)(C) urged by appellants, is evident:

To the maximum extent practicable the section 102(2)(C) procedure *should be applied to further major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment* of [the NEPA] on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that *further incremental major actions be shaped so as to minimize adverse environmental consequences.* It is also important in further action that *account be taken of environmental consequences not fully evaluated at the outset* of the project or program.

---

9. Although this formulation might compel the preparation of impact statements for projects that are so nearly complete that there is no reasonable prospect that the decision to proceed as planned would be reversed, that is no reason to adopt a lesser standard and thereby encourage bureaucratic evasion of responsibility. As Judge Friendly has put it:

To permit an agency to ignore its duties under NEPA with impunity because we have serious doubts that its ultimate de-

cision will be affected by compliance would subvert the very purpose of the Act and encourage further administrative laxity in this area. . . . [P]reservation of the integrity of NEPA necessitates that the Commission be required to follow the steps set forth in § 102, even if it now seems likely that those steps will lead it to adhere to the present result.
\City of New York v. United States, 337 F.Supp. 150, 160 (E.D.N.Y.1972).

36 Fed.Reg. at 7727. (Emphasis added.) Such an administrative interpretation by the agency charged with implementing and administering the NEPA is entitled to great weight. United States v. Leslie Salt Company, 350 U.S. 383, 396, 76 S.Ct. 416, 100 L.Ed. 441 (1956).

Further, TVA's own regulations support appellees' arguments. These regulations provide for the preparation of an impact statement whenever "an action is determined to be a major action significantly affecting the quality of the human environment . . . ." 36 Fed. Reg. 21010, 21012 (1971). "Actions" are defined to include "continuing activities," and can be either "proposed" or "ongoing." *Id.* at 21011. In addition, TVA has recognized that the NEPA has "declared congressional policy that agencies should administer their statutory authorities so as to restore, preserve and enhance the quality of the environment . . . ." 18 C.F.R. § 304.2 (1972). TVA's own regulations thus require an expansive interpretation of the requirements of section 102(2)(C), and make no distinction with respect to the obligation to apply the Act to proposed or ongoing activities for projects initiated before January 1, 1970. It is axiomatic that TVA is bound by the terms of its own regulations. Pacific Molasses v. FTC, 356 F.2d 386, 389–390 (5th Cir. 1966); *cf.* Clemons v. United States, 245 F.2d 298, 301 (6th Cir. 1957). Accordingly, since Tellico is clearly an "ongoing activity," and since the flooding of the Little Tennessee valley is still a "proposed action," the requirements of section 102(2)(C) must be satisfied.

This conclusion, we believe, comports with the trend of the case law in this area.

Although many courts have held that the NEPA does not apply retroactively to invalidate or reopen decisions made or other federal action completed prior to January 1, 1970, Concerned Citizens of Marlboro v. Volpe, 459 F.2d 332, 335 (3d Cir. 1972); Greene County Planning Board v. FPC, 455 F.2d 412, 424 (2d Cir.), cert. denied, —— U.S. ——, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d 613, 624 (3d Cir. 1971); Elliot v. Volpe, 328 F.Supp. 831, 835–836 (D. Mass.1971); Investment Syndicates, Inc. v. Richmond, 318 F.Supp. 1038, 1039 (D. Or.1970); Sierra Club v. Hardin, 325 F. Supp. 99, 126 n. 52 (D.Alaska 1971), *but see* Nolop v. Volpe, 333 F.Supp. 1364, 1367–1368 (D.S.D.1971), nevertheless, it appears to be settled that these decisions do not require a conclusion that the NEPA is inapplicable to any federal project initiated before January 1, 1970, or that a project that has advanced to the stage of completion that Tellico has reached necessarily falls outside the specific terms of section 102(2)(C). *See* Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1330–1332 (4th Cir. 1972); Greene County Planning Board v. FPC, *supra,* 455 F.2d at 424; Natural Resources Defense Council, Inc. v. Grant, 341 F.Supp. 356, 365 (E.D.N.C.1972); Morningside-Lenox Park Association v. Volpe, 334 F. Supp. 132, 144–145 (N.D.Ga.1971); Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army, 331 F.Supp. 925 (D.D.C.1971); Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army, 325 F.Supp. 728, 743–744 (E.D.Ark.1971); Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army, 324 F.Supp. 878 (D.D.C.1971); *see also* Calvert Cliffs' Coordinating Committee, *supra,* 449 F.2d at 1118, 1121 n. 28, 1128–1129; Zabel v. Tabb, 430 F.2d 199, 213 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971).

In at least two cases courts have enjoined, on the basis of noncompliance with section 102(2)(C), further construction on projects well advanced by January 1, 1970. In Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army, 325 F.Supp. 728 (E.D.Ark.), injunction granted, 325 F. Supp. 749 (E.D.Ark.1971), injunction vacated and case dismissed, 342 F.Supp.

1211 (E.D.Ark.1972), aff'd, 470 F.2d 289 (8th Cir. 1972), the court enjoined the construction of the Gilham Dam on the Cossatot River in Arkansas. The dam was a major component of a project that had been authorized in 1958 and was, by the time of the lawsuit, 63% complete. The defendants had acquired the necessary real estate and had substantially completed work on the spillway and outlet works, and all that remained was the construction of the embankment across the river and the clearing of the lake area. In Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army, 324 F. Supp. 878 (D.D.C.1971), the court granted a preliminary injunction against further construction of the Cross-Florida Barge Canal, which had been authorized by Congress in 1942 and upon which construction had begun in 1964. By the time of the lawsuit, about one-third of the project had been completed, including the filling of a reservoir, the construction of several locks and of other canal structures, and the excavation of parts of the canal itself. In both cases, the projects had been designed, authorized, and initiated before 1970, and accordingly, in both cases there was no "proposal for action" within the narrow meaning urged by appellants herein. Yet, in both cases the NEPA, including section 102(2)(C), was held to be applicable.

Moreover, contrary to appellants' assertions, the court in the Arkansas case did not rest its decision on the fact that the letting of the contract for the construction of the dam constituted a separate and distinct stage of the project for which an impact statement should be required. The court did not concern itself either with the method of accounting or construction utilized by the defendants or with the question whether the construction of the embankment constituted a separate "stage" of the project that would amount to a "proposal" within the meaning of section 102(2)(C). In rejecting the argument that the NEPA was inapplicable to a project on which

substantial work had been done prior to both the effective date of the Act and to the date of the lawsuit, the court took a broader view of the question presented:

> The Court is not suggesting that the status of the work should not be considered in determining whether to proceed with the project. It is suggesting that the degree of the completion of the work should not inhibit the objective and thorough evaluation of the environmental impact of the project as required by NEPA. Although the attitude of the defendants is understandable, nevertheless, as the Court interprets NEPA, the Congress of the United States is intent upon requiring the agencies of the United States government, such as the defendants here, to objectively evaluate all of their projects, regardless of how much money has already been spent thereon and regardless of the degree of completion of the work.

325 F.Supp. at 746.

In addition, we reject appellants' contention that courts should determine whether separate, significant "stages" of a project begun prior to 1970 remain to be constructed, and that only in a case like the Arkansas decision, in which the most important part of the project had yet to be begun, should courts apply the provisions of the NEPA. We do not believe that the NEPA admits of an interpretation that projects are to be divided into separate stages for purposes of determining whether federal officials must comply with sections 101 and 102. See Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013, 1022–1024 (5th Cir. 1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972). This is not to say that the degree of completion of a project is irrelevant; the amount of completed construction or investment will certainly affect the ultimate determination whether modifications should be made in the project or whether the project should be abandoned, and the degree to which the significant environmental effects have

occurred will affect the determination whether a project is still a "proposal for action" within the meaning of section 102(2)(C).  *Cf.* Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1331 (4th Cir. 1972).

Further, the "separate stage" analysis would not only attach an unwarranted importance to the accounting or construction methods utilized by particular agencies (and might encourage the adoption of methods intended to circumvent the requirements of the NEPA), but would also, we believe, be difficult to apply.  In the Arkansas case, for example, it could be argued that the most significant stage of the project had already been completed: all of the land had been acquired, most of the structures had been erected, and two-thirds of the money had been spent, and there remained only the construction of the final component that would allow the impounding of the river.  In the appeal before us, construction was planned differently—the concrete portion of the dam was the first completed element of the project—but the dam is inoperable until the earthen embankments are constructed.  This phase was not begun until shortly before the hearing below—long after the effective date of the NEPA.  Moreover, the connecting canal has not been begun, much land still must be acquired, and many major roads have still to be relocated.  In which case should it be said that a major, separate "stage" remained to be constructed?

Even if a segmented analysis should be employed, we would conclude that the only significant "stage" of construction is that which directly causes the significant environmental effects anticipated by the project planners.[10]  Until that stage is completed, government officials charged with making the ultimate deci-

sions regarding the future of the project are entitled to comprehensive, objective information concerning *all* of its benefits and costs before they decide to give final approval to its consummation:

> At the very least, NEPA is an environmental full disclosure law.  The Congress, by enacting it, may not have intended to alter the then existing decisionmaking responsibilities or to take away any then existing freedom of decisionmaking, but it certainly intended to make such decisionmaking more responsive and more responsible.

Environmental Defense Fund, Inc. v. Corps of Engineers, *supra*, 325 F.Supp. at 759.  *See* National Helium Corporation v. Morton, 455 F.2d 650, 656 (10th Cir. 1971); Calvert Cliffs' Coordinating Committee, *supra*, 449 F.2d at 1118, 1121 & n.28, 1129; Natural Resources Defense Council, Inc. v. Grant, 341 F. Supp. 356, 365 (E.D.N.C. 1972); Izaak Walton League of America v. Schlesinger, 337 F.Supp. 287, 294–295 (D.D.C. 1971); Scherr v. Volpe, 336 F.Supp. 889–890 (W.D. Wis. 1971); Morningside-Lenox Park Association, Inc. v. Volpe, 334 F.Supp. 132, 144 (N.D. Ga. 1971); Nolop v. Volpe, 333 F.Supp. 1364, 1368 (D.S.D. 1971); *see also* Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827 (D.C. Cir.), dismissed as moot, 337 F.Supp. 170 (D.D.C. 1972); Businessmen Affected Severely by Yearly Action Plans, Inc. v. District of Columbia City Council, 339 F.Supp. 793 (D.D.C. 1972).

Accordingly, we hold that the NEPA is applicable to the Tellico Project, that the continuing construction of the project is a "proposal for action" within the meaning of section 102(2)(C), and that appellants are required to file an environmental impact statement regarding

---

10.  For example, even if permits have been issued by the Atomic Energy Commission for the construction of nuclear power plants, and the plants were constructed prior to January 1, 1970, impact statements must be prepared and circulated by the AEC before it issues operating

licenses for the plants.  Izaak Walton League of America v. Schlesinger, 337 F. Supp. 287, 294–295 (D.D.C.1971); see Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1127–1129 (1971).

the project. We emphasize, however, that we intimate no opinion on the question of the advisability of proceeding with the project or on the question whether plaintiffs may challenge, under the NEPA, the ultimate decision to proceed.[11]

## III

■ The same result obtains if we construe the phrase "proposals for legislation" in section 102(2)(C) as did the District Court to encompass annual appropriations requests. Under 31 U.S.C. § 22, the head of each federal agency must prepare each year a request for regular, supplemental, or deficiency appropriations to be submitted to Congress by the President under 31 U.S.C. § 11. Unquestionably, to construe these budgetary requests as proposals for legislation within the meaning of the NEPA would facilitate Congress' expressed purpose of constant revision and reevaluation of ongoing projects.

Apparently in recognition of this, the Council on Environmental Quality, in its Guidelines to which we referred above, interpreted "actions" covered by section 102(2)(C) to include "[r]ecommendations or favorable reports relating to legislation *including that for appropriations.*" 36 Fed.Reg. 7724 (1971) (emphasis added). And, TVA's regulations track the CEQ's Guidelines by providing that "actions which may affect the quality of the environment," and which therefore require the preparation of an impact statement, include "[r]ecommendations or reports relating to legislation

or appropriations." 36 Fed.Reg. at 21012.

Appellants claim, however, that there is a distinction between "legislation" and annual appropriations for purposes of construing section 102(2)(C). They urge that the former refers to a change in existing law but the latter constitutes merely a routine authorization to disburse funds. Appellants contend that the standing rules of both the House of Representatives and the Senate embody this distinction and that it can be assumed that Congress was aware of the distinction when it approved the use of the word "legislation" in section 102(2)(C). *See also* United States v. Dickerson, 310 U.S. 554, 559, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940).

We find this contention unconvincing. First, it ignores the TVA regulation quoted above that requires the preparation of an impact statement for reports relating to appropriations as well as for reports relating to other "legislation." More significantly, the Congress may have valid reasons for distinguishing between "legislation" and "appropriations" for purposes of determining procedural matters such as deciding the proper committee to which to refer a bill or the time or duration of legislative debate. But that does not require us to close our eyes to the commonly accepted meaning of the word "legislation"—the making or giving of laws—or to the clearly expressed congressional purpose of the NEPA.

We are also unconvinced by appellants' argument that the District Court's

11. Courts and commentators have differed whether NEPA creates a right assertable by private plaintiffs to challenge the ultimate decision to proceed with a project as originally planned. *Compare, e. g.,* Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army, 470 F.2d 289 (8th Cir.); Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971); State of Delaware v. Pennsyln. 11 (D.Del.1971); Hanks & Hanks, *supra* note 7; Yannacone, National Environmental Policy Act of 1969, 1 Envir. Law 8 (1970), *with* Scenic Hudson Preservation Conference v. FPC, 453 F.2d vania New York Central Transportation Company, 323 F.Supp. 487, 494 463, 481 (2d Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972); Upper Pecos Association v. Stans, 452 F.2d 1233, 1236 (10th Cir. 1971), cert. granted, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 330 (1972); Environmental Defense Fund, Inc. v. Corps of Engineers, 348 F.Supp. 916 (N.D.Miss. 1972); Conservation Council of North Carolina v. Froehlke, 340 F.Supp. 222, 225–226, 228 (M.D.N.C.1972).

construction of the Act would place an enormous administrative burden on federal agencies. Once an initial statement has been prepared and circulated, annual revisions or additions can be made with very little effort or expense. In most cases, an annual refiling of the original impact statement with confirmation that the project is proceeding as anticipated and that no unforeseen environmental effects have developed would likely suffice. In other cases, the initial impact statement may require extensive revision and supplementation.

■ Finally, we are unimpressed with appellants' argument that Congress authorized appropriations for Tellico in 1970 and 1971 even though environmental impact statements had not been filed. To paraphrase Mr. Justice Douglas, ". . . Congress did not intend, by approving funds for the [Tellico Project], to repeal the NEPA as it applied to the [project]. . . . Other federal courts have similarly concluded that congressional appropriations for a project subject to NEPA are not to be taken as expressing any view with respect to compliance with NEPA. Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 749, 762–763." Committee for Nuclear Responsibility, Inc. v. Schlesinger, 404 U.S. 917, 919, 92 S.Ct. 242, 243, 30 L.Ed.2d 191 (1971) (Douglas, J., dissenting); cf. Natural Resources Defense Council, Inc. v. Morton, 458 F. 2d 827, 836 (D.C. Cir. 1972).

Accordingly, we hold that the District Court did not err in holding that TVA's annual appropriations requests constitute "proposals for legislation" within the meaning of section 102(2)(C). At least to the extent that a project can still be said to be ongoing, the decision makers are entitled to all information relevant to a determination whether to abandon the project or to alter it. Thus, as long as appropriations are necessary for the continued construction of a project, impact statements should be filed. This holding of the District Court has been approved by at least one other court, Natural Resources Defense Council, Inc. v. Grant, 341 F.Supp. 356, 365 (E.D.N.C. 1972), and we approve it here.

## IV

■ Appellants also claim that the District Court should not have issued the preliminary injunction because of appellees' delay in bringing suit, and that he should have made findings on the issue of laches. To prevail, appellants must show that plaintiffs unreasonably delayed in bringing suit and that appellants were prejudiced by this delay; the mere lapse of time does not constitute laches. E. g., Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238, 246 (M.D.Pa.1970), aff'd, 454 F.2d 613, 625 (3d Cir. 1971). The NEPA became effective on January 1, 1970, and this suit was originally filed, albeit in the wrong court, on August 11, 1971. We do not believe that this delay was unreasonable. Appellees were entitled to assume that appellants would comply with requirements of the Act, especially after the promulgation of the interim guidelines of the Council on Environmental Quality on April 30, 1970. Indeed, this assumption proved justified because in June 1971 appellants did file a draft impact statement, which appellees then viewed (as subsequently did the District Court) as inadequate. Two months after this statement was submitted, after appellees had an opportunity to study it and consult experts of their own, this suit was filed. Under these circumstances, appellees' delay was not unreasonable. See Natural Resources Defense Council, Inc. v. Grant, 341 F.Supp. 356, 368 (E.D.N.C. 1972).

■ Consideration of the public interest also requires us to reject the defense of laches. The strong policy embodied in the NEPA concerning the importance of agency consideration of environmental values militates against barring this suit on the ground of unreasonable delay, Arlington Coalition on Transportation v. Volpe, supra, 458 F.2d at 1329–1330, although the delay un-

doubtedly will affect the ultimate decision whether to proceed with the project as planned. There is also the public interest in requiring public officials to obey statutory mandates: "The tardiness of the parties in raising the issue cannot excuse compliance with NEPA; primary responsibility under the Act rests with the agency." City of New York v. United States, 337 F.Supp. 150, 160 (E.D.N.Y. 1972). *Cf.* Calvert Cliffs' Coordinating Committee, *supra,* 449 F.2d at 1119. These considerations may in part explain why courts have not been receptive to foreclosing litigation on the issues raised in this appeal on the ground of plaintiffs' delay in bringing suit. *See* Arlington Coalition on Transportation v. Volpe, *supra,* 458 F.2d at 1330; Natural Resources Defense Council, Inc. v. Grant, *supra,* 341 F.Supp. at 368; Nolop v. Volpe, *supra,* 333 F.Supp. at 1367; Harrisburg Coalition Against Ruining the Environment v. Volpe, 330 F.Supp. 918, 924–926 (M.D. Pa. 1971); Cape May Chapter, Inc., Izaak Walton League of America v. Macchia, 329 F. Supp. 504, 515 (D.N.J. 1971); Elliot v. Volpe, 328 F.Supp. 831, 841–842 (D. Mass. 1971); Pennsylvania Environmental Council, Inc. v. Bartlett, *supra,* 315 F.Supp. at 246; *cf.* Greene County Planning Board v. FPC, 455 F.2d 412, 425 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972).

## V

Appellants' final contention is that the District Court erred in granting the preliminary injunction without making a specific finding that plaintiffs would suffer irreparable harm if the injunction were not granted, and that the court should have refused to grant the injunction so that the "status quo" could be maintained pending final resolution and so that a costly delay in completing the project could be avoided. This contention is clearly without merit.

In their motion for a preliminary injunction, plaintiffs alleged that they would suffer irreparable harm from the continuation of the construc-

tion activities of appellants that were permanently defacing the natural environment. Submitted along with this motion were affidavits of residents in the project area and other observers concerning activities of appellants such as the cutting and burning of timber, the movement of massive amounts of earth, the construction of large earthworks, and the relocation of roads and bridges. Plaintiffs' motion also referred to the condemnation of land and the resulting eviction of the former owners of the condemned properties. The District Court found that the activities relating to irreparable defacement of the environment were continuing, 339 F.Supp. at 808, and recognized that it had to consider the interests and injuries asserted by the parties, 339 F.Supp. at 812. Thus, the court clearly considered the allegations of irreparable harm made by plaintiffs as well as the harm that would allegedly result from issuing the injunction, and it concluded that the scales tipped in favor of plaintiffs. Plainly, the court found that plaintiffs would suffer irreparable harm if the injunction were not granted, and this finding is supported by the record.

More important, appellants misconceive the purpose of a preliminary injunction in this context. As the court stated in Scherr v. Volpe, 336 F.Supp. 882, 886 (W.D. Wis. 1971):

the continuing construction work by defendants and those working in concert with them, if allowed to continue, will make it impossible to restore the area in question to its previous environmental status. Thus, plaintiffs' rights would be sacrificed before a complete hearing and determination on the merits of their contention. The purpose of granting the preliminary injunction is to preserve the subject matter of this controversy in its existing condition.

In addition, the more time and resources appellants are allowed to invest in this project, the greater becomes the likelihood that compliance with section 102 of the NEPA, and the reconsideration of

the project in light of the provisions of section 101, will prove to be merely an empty gesture. Arlington Coalition on Transportation v. Volpe, *supra,* 458 F.2d at 1327, 1332–1334. Accordingly, "unless the plaintiffs receive *now* whatever relief they are entitled to, there is danger that it will be of little or no value to them or to anyone else when finally obtained." Lathan v. Volpe, 455 F.2d 1111, 1117 (9th Cir. 1971).

Finally, the preliminary injunction, as we stated earlier in this opinion, is the vehicle by which a declared congressional policy can be effectuated. Sufficient irreparable harm, even apart from the considerations discussed above, can be found in the continuing denial by appellants of appellees' right under the NEPA, Izaak Walton League of America v. Schlesinger, 337 F.Supp. 287, 295 (D. D.C. 1971); City of New York v. United States, *supra,* 337 F.Supp. at 160, and this is enough to justify issuing the injunction. Lathan v. Volpe, *supra,* 455 F.2d at 1116–1117.

Accordingly, we find no error in the order of the District Court.

Affirmed.